IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KIMBERLY L. MARTIN, | |
| Plaintiff, | 8:17-CV-121 |
| vs. | |
| NEBRASKA METHODIST HEALTH SYSTEM, INC., | MEMORANDUM AND ORDER |
| Defendant. | |

The plaintiff, Kimberly L. Martin (formerly Kimberly Marx), brings this action alleging in her amended complaint (filing 1-2) claims of disability discrimination under both state and federal law (Neb. Rev. Stat. § 48-1104 and 42 U.S.C. § 12101 et seq.), retaliation pursuant to both state and federal law (Neb. Rev. Stat. § 48-1114 and 42 U.S.C. § 12203), violation of the Family Medical Leave Act (42 U.S.C. § 2601 et seq.), whistleblower retaliation (§ 48-1114), and violation of the Nebraska Wage Payment and Collection Act (Neb. Rev. Stat. § 48-1228 et seq.). The defendant, Nebraska Methodist Health, has moved the Court for summary judgment regarding all claims. (Filing 48) The Court will grant Methodist's motion and dismiss Martin's amended complaint.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

Martin began working for Methodist on May 29, 2007. Filing 1-2 at 2. Between 2013 and her eventual separation from Methodist on November 16, 2016, Martin was a mammographer providing services at two of Methodist's imaging facilities. Filing 49 at 3. Beginning May 1, 2013, Sue Collins, the Imaging Services Leader, began directly supervising Martin and the other mammographers. Previously, Collins was the direct supervisor of Jeanine Halstead, and Halstead directly supervised Martin and the other mammographers. When Halstead's job was eliminated, Collins assumed her direct supervision responsibilities. Filing 55-8 at 3-4.

Martin believes that she started having difficulties with Collins in 2012 when she raised concerns about the appearance of the walls at the new Women's Hospital Clinic. It was discovered that a discoloration on the walls was caused by an over-spray of alcohol from spray bottles used to clean the

mammography equipment. Filing 55-5 at 39-44. Martin reported her concerns to Collins but said that Collins told her there wasn't money in the budget to repaint the walls. Sometime later, Martin addressed her concerns about the walls to individuals higher up the Methodist management chain from Collins, and the walls were then repainted. Although Martin cannot recall if Collins ever criticized her for going over Collins' head to upper management, Collins' supervisor, Jennifer Brase, told Martin that she should address such matters within the department. Filing 55-5 at 43.

In December 2013, Martin again went outside Methodist's management chain to report what Martin believed was a violation of Methodist's policy. Martin's friend, Kathy Schultz, was concerned because the person filling Collins' supervisory role while Collins was on vacation was angry at Schultz when Schultz, contrary to the substitute supervisor's instruction, called a patient back for additional mammogram images. Filing 49 at 4. Martin suggested that Schultz should report her concern to the Clinic's administrator, which Martin then did on Schultz' behalf.

On January 13, 2014, Collins prepared a Methodist misconduct documentation form regarding Martin. Filing 49-3. The report was critical that Martin "often goes outside of the Division and involves other MHS Administrators in issues that pertain to imaging." Collins also documented that she spoke with Martin about her cell phone use while in the clinic. Martin, however, believed that Collins was singling her out on the cell phone issue and began taking photos of other mammographers—Martin's coworkers—using their cell phones during clinic hours. Filing 55-5 at 212-16.

In April 2014, issues arose when Martin requested family medical leave to care for her adult son who had broken his leg in a trampoline accident. Filing 55-5 at 73-74, 77-82. Leave was initially denied by the Director of Employee

Relations because Martin's son was an adult. But that decision was rescinded and Martin was granted the requested leave. Although Martin claims that Collins later told her she would have to make up the time that she was out on family medical leave by being on-call (a comment Collins disputes), the hours were never actually made up. Filing 49 at 6-7.

A meeting was held on September 2, 2014, between Collins and Martin to go over Collins' 2014 evaluation of Martin's job performance. Filing 55-5 at 164-75; filing 49-5. The evaluation form required both Martin and Collins to rate Martin's performance on a 4-point scale. Generally, Collins' ratings were equal to or exceeded Martin's self-ratings except in one category: Collins rated Martin lower regarding her workflow. Although the evaluation appears to be favorable overall, Martin perceived it to reflect a poor performance. Filing 1-2 at 2-3. Claiming that she did not trust Collins, Martin surreptitiously recorded the meeting on her phone. Filing 55-5 at 165-66; filing 55-4 exhibit B-3. The recording reflects that the tone of both Collins and Martin during the evaluation was cordial, if not friendly, and positive. Among the issues discussed were conflict resolution with others, and how at times Collins may not have understood Martin. Near the end of the recording (which is presumably the end of the meeting), Collins can be heard to say that she was there to help Martin with whatever she needed.

In January 2015, Martin requested, and was granted, family medical leave regarding her younger son's medical conditions. In April she requested additional family medical leave concerning her own serious health condition, and again leave was granted. Filing 1-2 at 3. In late April 2015, Martin met with Lori Beaver, the Methodist Physicians Clinic administrator, regarding concerns about her job security. Filing 55-5 at 152. Martin claimed that she was being harassed and retaliated against for reporting violations of company

policy. Filing 1-2 at 3. Martin played Beaver a portion of the recorded performance evaluation meeting with Collins. Filing 55-5 at 152-53. Beaver instructed Martin to contact Paula Pittman, Methodist's Director of Employee Relations, in the human resources department, which she did. Filing 55-7 at 2.

Martin met with Pittman on May 6 and complained about the same job security issues she reported to Beaver. Filing 1-2 at 3. Martin played her recording of the meeting with Collins and claimed that Pittman's eyes got "as big as golf balls at part of the recording she heard." Filing 55-5 at 200. Martin also claims that Pittman agreed to keep their meeting confidential. Pittman's recollection is different. She recalls that Martin was concerned she was being forced to use paid time off when she would rather not draw from her paid time off bank, and had additional questions about how Collins was interpreting other Methodist policies. Filing 55-7 at 20. Pittman said that Collins portrayed the recording as a "smoking gun" of Collin's harassing behavior, but Pittman heard it differently. Filing 55-7 at 22-23. What Pittman heard was Collins sharing "many wonderful things" about Martin's performance, with just a few constructive criticisms. Pittman told Martin that she did not share her view of what the recording reflected and that there were some perception issues on Martin's part regarding her interactions with Collins.

Martin requested and was given additional family medical leave in June 2015. She was absent for approximately three weeks. On July 28, Collins called Martin into her office to discuss a disciplinary action. Filing 1-2 at 3-4. Martin claims that the first thing Collins said to her when she walked into Collins' office was "do you have your cell phone on you?" Filing 55-5 at 210. Martin said she did, so Collins told her to put it in her locker. Martin believed that Pittman must have told Collins that she recorded their last meeting, and that by having her put her cell phone away Collins would prevent Martin from recording this

meeting. But apparently Martin was prepared for just such an occurrence and when she put her cell phone away, she still had a different recording device that she used to surreptitiously record the meeting yet again. Filing 55-4 exhibit B-1. The recording reflects that this meeting was contentious.

Collins presented Martin with a written warning that addressed issues concerning Martin's workflow, timely completion of quality control duties, Martin's unilateral decision to assist another staff member with bone density scans, and her continuing use of her cell phone during work hours. Filing 49-6 at 1. Although not included in the written warning text, other staff members had expressed their concerns to Collins about Martin and her behaviors. In the recording, Collins can be heard to say that Martin continually pushes the envelope and that she knows what she is doing. Martin can be heard to accuse Collins of creating a hostile work environment and that she was being singled out on the cell phone issue.

Martin had been diagnosed with several mental health conditions—nearly all of which predated her problems with Collins. As of August 2015, Martin was receiving treatment for obsessive-compulsive disorder (OCD), attention-deficit hyperactivity disorder (ADHD), major depressive disorder, and generalized anxiety disorder. Filing 49-7 at 26. Without going into unnecessary detail, Martin's personal life was more chaotic than the difficulties she was experiencing at Methodist. On September 11, Martin submitted another family medical leave request regarding her own serious health conditions. Filing 55-4 at 3-4. She requested leave from September 14 to October 14, and her leave request was approved. On October 10, Martin requested an extension of her leave through November 14, which once again was approved. Filing 1-2 at 4; filing 55-7 at 63.

On November 5, Martin's treating therapist, Kimberly Rist, provided a handwritten note to Methodist regarding Martin's capacity to return to work. Filing 49-7. The note provided that Martin "can return to work on November 9, 2015 with no restrictions except that she will require an accomadation (sic) of not being supervised by Sue Collins." The note was faxed to Methodist's Employee Health nurse Roberta Opperman, the person charged with implementing an employee's return to work. Filing 55-9 at 3, filing 55-5 at 228. Pittman also received a copy of the note, but not from Opperman.

That same day, Pittman emailed Opperman informing her that Martin was released to return to work on November 9 with "the accommodation of not having to work for her current supervisor Sue Collins." Filing 55-9 at 48. Pittman wrote that Methodist was unable to accommodate Martin's request, and Pittman believed the request was not reasonable or practicable for Methodist to do. Opperman replied that she had met with Martin prior to receiving Pittman's email and knew about the therapist's return to work accommodation. Opperman also knew that the requested accommodation would not be accepted and told Martin as much. Martin, yet again, surreptitiously recorded her meeting with Opperman, and it is evident in listening to the recording that Martin was disappointed when Opperman told her about the accommodation denial. Filing 55-4 exhibit B-2. Pittman asked Opperman if Martin still planned to return if her supervisor wasn't changed, and Opperman replied that she didn't ask Martin that question. Filing 55-9 at 49.

The return-to-work process at Methodist for someone with behavioral health issues included participation in the employee assistance program. Filing 55-9 at 9-10. Opperman scheduled Martin's first appointment with the employee assistance program for November 6. On November 9, Martin's

employee assistance program counselor reported that Martin was safe to return to work but that she continued to assert that she could not return to work under Collins' supervision. Filing 55-9 at 14. Opperman met with Martin several times during the return to work process and directly asked her if there was anything else that Methodist could do to return her to work. Opperman said Martin repeatedly told her that she could not return to work if she had to report to Sue Collins. Filing 55-9 at 11-12.

On November 6, attorney Heather Voegele emailed a letter to Pittman that demanded settlement of Martin's claims. Filing 55-1 at 15. Absent from Voegele's letter was any discussion of Martin's return to work. Instead, Voegele demanded a lump-sum settlement regarding Martin's damages and attorney fees, as well as a "mutually agreed upon reference letter and statement for reference inquiries, in order for her to pursue future employment." Filing 49-8 at 3. Voegele's letter seemed to indicate Martin did not intend to return to her job at Methodist. Pittman forwarded the letter to her superior and was told to "decline the offer and tell them to get in line." Filing 55-1 at 15.

Pittman's response to Voegele was not as abrupt. On November 9, Pittman emailed Voegele and politely informed her that Methodist believed Martin's allegations were without merit and Methodist would reject the settlement demand. Filing 55-7 at 67. In addition, Pittman asked Voegele how the interactive process to return Martin to work at Methodist should unfold—would Voegele handle the discussion or would Martin prefer "to visit with HR and Employee Health directly." Voegele responded the next day by email but did not address Pittman's question about the interactive process. Instead, Voegele merely acknowledged knowing that the accommodation proposed by Martin's therapist was denied. Pittman emailed a reply within an hour, and again asked Voegele about engaging in the interactive process to return Martin

to work, writing: "[i]f your client is willing to explore other options or engage further in the process she can call me at the below number." Filing 55-7 at 66.

Voegele and Pittman exchanged more emails on November 11. Voegele first asked what accommodations Methodist would be willing to make. Filing 55-7 at 65. Pittman responded by again inviting Martin to engage in the interactive process, but she did not suggest alternate accommodations. Although Pittman invited Martin's participation in the interactive process to facilitate her return to work, it is clear that she and others at Methodist hoped Martin would not return. In an email dated November 5, Collins told her supervisor, Jennifer Brase, "It's been so nice the past 2 months for everyone"— referring to Martin's absence on family medical leave. Filing 55-1 at 17. Brase responded by speculating that "I don't think we will see her back." Collins' response was, "I hope you are right." On November 12, after Martin and Voegele had not indicated a willingness to engage in the interactive process, Pittman emailed Opperman to remind her that if Martin called, Methodist's position was that they offered and encouraged Martin's engagement in the interactive process. Filing 55-7 at 65.

On November 13, Voegele emailed Pittman asking where things stood regarding Martin's employment. Filing 49-9 at 1. Pittman responded that she understood that Martin was released to return to work on November 16, and that Methodist was unable to change Martin's supervisor—an accommodation Methodist felt was unreasonable. Voegele emailed back: "Please explain to me how [Martin] can be cleared to come back to work when her accommodation is not being met?" Pittman answered via email: "The requested accommodation of a new supervisor is not reasonable. We have repeatedly indicated a willingness to interactively evaluate any other needed accommodations, and have been made to understand that none are requested." Apparently in

response, Voegele prepared a correspondence to Pittman asserting that it was Martin's therapist who required her to no longer report to Collins, and since Methodist refused to accommodate Martin in a manner that would allow her to return to work, Methodist had constructively discharged Martin. Filing 49-11. In another correspondence that same day, Voegele renewed her demand for a lump-sum settlement of damages and attorney fees without mentioning a return to work. Filing 49-10. Martin's employment with Methodist ended as of November 16, 2015.

On March 1, 2016, Martin filed a charge of discrimination with the Nebraska Equal Opportunity Commission. Filing 49-2. In summary, Martin claimed that she was harassed for taking family medical leave for her son in April 2014, retaliated against for complaining about how paid time off was assessed and complaining about not being paid for all hours worked, singled out and harassed for cell phone use, and terminated when Methodist denied her doctor's reasonable accommodation to allow her to return to work.

On June 20, 2016, Martin applied for an open x-ray technician position at Methodist Physicians Clinic in Valley, Nebraska. Filing 55-5 at 111-12. Methodist's human resources department screened the several applications on file for qualified candidates and forwarded Martin's application and two others to the clinic manager Patricia Petersen. Filing 55-10 at 3-4. Petersen reviewed the applications and saw that one applicant lived in downtown Omaha, and another lived in Valley. Filing 55-10 at 3. Petersen called the downtown Omaha applicant first, and when the applicant found out the position was in Valley, she took herself out of the running. Next, Petersen called the applicant who lived in Valley and set up an interview for the next day (or perhaps the day after that). Filing 55-10 at 3, 6.

Petersen saw that Martin was a former Methodist employee and that Sue Collins was her supervisor. Petersen, who knew Collins, elected to call Collins before contacting Martin. Filing 55-10 at 3. Peterson first asked Collins what Collins could tell her about a former employee named Kim Martin, and Collins said she didn't know who that was. Filing 55-8 at 31-32. After Petersen indicated that Martin's last name formerly was Marx, Collins told her that she should contact HR, and said nothing more. Filing 55-8 at 32; filing 55-10 at 3. Petersen said that after her conversation with Collins, she set Martin's application aside. Petersen thought that Collins' response indicated an issue of some kind, but didn't know if it was "good, bad [or] whatever." Filing 55-10 at 8. Soon after speaking with Collins, Petersen received an email from Brian Schmidt, who was the head of radiology with the Methodist Physicians Clinics. Filing 55-10 at 8. Schmidt wanted Petersen to consider someone who was then working part-time for him, Jennifer Powell, who Schmidt believed would be a great fit for them. Peterson received Powell's application the next day and called her to set up an interview. Filing 55-10 at 3. After interviewing her, Petersen found Powell to be "exactly the fit we needed" and offered her the position, which Powell accepted. Petersen said she never followed-up with HR on Martin because she found Powell to be perfect for their needs.

### III. DISCUSSION

#### 1. DISABILITY DISCRIMINATION

Martin alleges disability discrimination claims pursuant to the Nebraska Fair Employment Practices Act (NFEPA), § 48-1101 *et seq.*, and the Americans with Disability Act of 2008 (ADA), 42 U.S.C. § 12101 *et seq*. Disability discrimination claims under the NFEPA and the ADA are analyzed within the same framework. *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1106 (8th

Cir. 2016). A plaintiff must prove three elements to obtain relief under the ADA. She must show: (1) that she is a qualified individual; (2) that she suffered discrimination; and (3) that the discrimination suffered was based on her disability. *Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013). To be deemed a "qualified individual" she must be able to perform the essential functions of the employment position with or without reasonable accommodation. 42 U.S.C. § 12111(8).

The ADA pertains to individuals who suffer an adverse employment action "because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. 12102(3)(A). Martin was diagnosed with several mental health conditions that can be impairing. However, Martin's mental health conditions did not prevent her from performing the "essential functions" of her employment with Methodist without accommodation. "Essential functions are the fundamental duties of the job, but not its marginal functions." *Kowitz v. Trinity Health*, 839 F.3d 742, 745 (8th Cir. 2016). Factors to be considered when assessing the fundamental duties of a job include; the functions the employer finds essential, functions described in a written job description, the time an employee is expected to spend performing the functions, the consequences of the functions not being performed, and whether other employees in similar jobs perform these same functions. *Id.* There is no evidence suggesting that Collins' supervision of Methodist's mammography section was an essential function of a mammographer's job duties.

In fact, Martin agrees that supervision by Collins was not an essential function pertaining to her job duties as a mammographer while employed at Methodist. She admits that "[h]aving a certain supervisor is not a job duty. For example, Methodist removing Collins as Imaging Service Leader would not

change the essential functions of a mammography's (sic) position." Filing 54 at 25.

In the usual case, a disabled employee requests a reasonable accommodation to allow her to perform the essential functions of her job. *See Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003); Lipp v. Cargill Meat Solutions Corp., 911 F.3d 537, 546 (8th Cir. 2018)* (an individual requesting an accommodation must show that the accommodation will allow her to perform the essential functions of the job). Martin, however, claims to be able to perform the essential functions of her job without an accommodation, but nonetheless, requests an accommodation so that she can return to her job at Methodist. Martin's contentions on the surface seem paradoxical until consideration is given to all that the duty to reasonably accommodate a disabled employee involves. The need for a reasonable accommodation is not to be viewed narrowly by considering only an employee's ability to perform the essential functions of employment. A reasonable accommodation may also be necessary to allow a disabled employee "to enjoy equal benefits and privileges of employment as are enjoyed by [the employer's] other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii); *EEOC v. Life Techs. Corp., No. 1:09-cv-2569, 2010 WL 4449365, at *3-4 (D. Md. Nov. 4, 2010).*

Assuming Martin's request concerned an accommodation that would allow her to enjoy equal benefits and privileges of employment, the question then becomes whether Martin's requested accommodation is reasonable. Martin's counselor provided a handwritten note stating that Martin could return to work "with no restrictions except that she will require an accomadation (sic) of not being supervised by Sue Collins." Filing 49-7. The note did not provide any specifics regarding why this accommodation was

necessary or how it related to Martin's mental health issues. There is no indication how Collins' supervision, as opposed to supervision by any other Methodist manager, would affect Martin's mental health. Opperman contacted Rist to discuss whether any other accommodation would be acceptable, but Rist refused to elaborate on her note. Methodist was never provided with an explanation why this particular accommodation was necessary, how it related to Martin's mental health, or why Collins' removal as Martin's supervisor was the one and only accommodation that would allow Martin to return to work.[1] Filing 55-9 at 12, 22; filing 55-3 at 30-31. At best, Methodist could only assume that the requested accommodation related in some way to Martin's disability. An employee "must provide relevant details of [her] disability and, if not obvious, the reason that [her] disability requires an accommodation." *E.E.O.C. v. Convergys Customer Mgmt. Grp.*, 491 F.3d 790, 795 (8th Cir. 2007).

Methodist was not obligated to provide Martin with the accommodation she requested. It need only provide a reasonable accommodation required by Martin's disability. *See Dick v. Dickinson State Univ.*, 826 F.3d 1054,1060 (8th Cir. 2016); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. (1999). Martin was required to make a facial showing that her requested reasonable accommodation was possible and that the accommodation would allow her to

---

[1] Rist is a clinical social worker and licensed mental health therapist and began counseling Martin in February 2015. Filing 55-3 at 1. Rist's progress notes indicate that in September, well before Martin's projected return to work at Methodist, Martin was reporting that she could not be supervised by Collins. Rist reported that Martin "doesn't want to return to work with this current supervisor" and that Martin was "not a good match with rigid supervisor." Filing 55-3 at 20-21. Rist's progress notes were not provided to Methodist to support her opinion regarding the need to remove Collins from her supervisory duties.

perform the essential functions of her job. *Lipp*, 911 F.3d at 546. Ordinarily, whether a requested accommodation is reasonable is a question of fact. *Convergys*, 491 F.3d at 796. However, the unreasonableness of a requested accommodation can be decided as a matter of law. *Id.*

An employee's demand for a different supervisor has been repeatedly found to be an unreasonable accommodation request. *See, Burchett*, 340 F.3d at 517-18; *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3rd Cir. 1998); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 527 (7th Cir. 1996) ("In essence, Weiler asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility.").

> Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons.

*Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2nd Cir. 1996).

Even if Martin's one and only requested accommodation was unreasonable, Martin contends that Methodist did not engage in the interactive process with her to determine whether a reasonable accommodation was possible. There is no per se liability if an employer does not engage in an interactive process, but such failure may be prima face evidence of an employer acting in bad faith. *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943 (8th Cir. 2018).

To show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Kallail v. Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012). The responsibility for resolving accommodation requests is shared between both the employer and employee. *Convergys*, 790 F.3d at 795.

Martin argues that Methodist failed to follow its own procedures and identify accommodations that would allow her to safely return to her job at Methodist. Filing 54 at 27-28. According to Martin, "[e]veryone thought [Martin's] requested accommodation was so galling and ridiculous; no one took her disability seriously. . . . What Methodist did was to bury their head in the sand hoping [Martin] would give up and quit." Filing 54 at 28. The record does not support Martin's argument. It was Martin who refused to consider any accommodation other than the removal of Collins as her supervisor. Pittman's emails and correspondence with Voegele repeatedly requested that Martin or Voegele engage in the interactive process to find an accommodation that was reasonable. Voegele, instead, ignored Pittman's requests and demanded a lump-sum settlement with a mutually agreed-upon reference letter for Martin to use in the future. Filing 49-8. Opperman testified that in her several conversations with Martin while she participated in the employee assistance program, Martin said the only accommodation she wanted was to not report to Collins. Filing 55-9 at 12.

The only evidence in the record is that Methodist acted in good faith to get Martin to engage in the interactive process, but Martin refused to participate. Instead, Martin repeatedly demanded that Methodist alter its management structure to accommodate her return to her job, and she was unwilling to consider any other resolution of her situation. "[E]mployment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kiel*, 169 F.3d at 1136.

Finally, there is no evidence that would allow a jury to find that Martin suffered discrimination based on her disability. Discrimination under the ADA means an adverse employment action. *Brown*, 711 F.3d at 888. Martin's amended complaint and briefing asserts that she was terminated from her job at Methodist. Filing 1-2 at 8, filing 54 at 26. However, there is no evidence that anyone at Methodist informed Martin that her employment was terminated. Instead, the evidence shows that Martin's separation from Methodist was voluntary, and an employee's voluntary resignation is ordinarily not considered an adverse employment action. *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003).

In the interest of completeness, the record reflects that Voegele, on Martin's behalf, informed Methodist that its refusal to accommodate Martin "in a manner that would allow her to return to work" represented a constructive discharge, and that Martin would not be returning to work "on November 16, 2015 or thereafter." Filing 49-11 at 1. To the extent that Martin continues to assert her discharge was constructive, the Court finds it was not.

"Constructive discharge occurs 'when an employer deliberately makes an employee's work environment so intolerable that resignation is the employee's

only plausible alternative.'" *Cosby v. Steak N Shake*, 804 F.3d 1242, 1246 (8th Cir. 2015) (quoting *Williams v. City of Kansas City, Mo.,* 223 F.3d 749, 753 (8th Cir. 2000)). Proof of a constructive discharge requires Martin to adduce evidence showing that (1) a reasonable person in Martin's situation would find the working conditions intolerable, and (2) that Methodist intended to force Martin to quit or could reasonable foresee that its actions would cause Martin to quit. *Richard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 186 (8th Cir. 2014). Whether Martin's working conditions at Methodist were intolerable is viewed from the perspective of a reasonable person in Martin's situation. *Gartman v. Gencorp Inc.*, 120 F.3d 127, 130 (8th Cir. 1997). Also, if Martin resigned without giving Methodist a reasonable opportunity to resolve her complaint, her discharge was not constructive. *Cosby*, 804 F.3d at 1246.

There is a complete absence of any evidence indicating that Martin's former job at Methodist was objectively intolerable. Moreover, there is no evidence that the job Martin was expected to return to in November was any different from her old job. The evidence indicates that Martin was expected to return to the same job that she had done for years without complaining that her working conditions were intolerable. It was the same job that she had done with Collins as her supervisor for a few years, again without complaining that the conditions of her employment were intolerable.

There is evidence that Collins, Collins' supervisor, and others in Methodist's human resources department, hoped that Martin would not return to work at the end of her medical leave. But completely absent is any evidence that Collins or anyone at Methodist did anything to make the job that Martin was to return to objectively intolerable. Further, there is no evidence that Methodist did something to force Martin to not return to her former mammography job, or to force her to resign. *See Phillips v. Taco Bell Corp.*, 156

F.3d 884, 890 (8th Cir. 1998). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit." *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir. 1996). It is clear that Martin was unhappy with the fact that Collins would be her supervisor, but "not everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir. 1997).

The Court finds when the record is taken as a whole, no rational trier of fact would find that Martin is entitled to relief under the ADA or NFEPA regarding a claim of discrimination or concerning her loss of employment with Methodist.

## 2. RETALIATION

Martin alleges in her complaint that Methodist retaliated against her by subjecting her to harassment, subjecting her job performance to higher scrutiny than others, removing some job duties, disqualifying her from bonuses, terminating her employment, and failing to rehire her in another position. Filing 1-2 at 9. But in her brief opposing summary judgment, Martin only relies on Methodist's failure to rehire her in July 2016. Filing 54 at 29-31.

To establish a retaliation claim under the ADA, Martin was required to show that she engaged in statutorily protected conduct, that she suffered an adverse employment action, and that the protected conduct was a but-for cause of the adverse action. *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013). The statutorily protected conduct Martin points to prior to her separation from Methodist concerns her complaints that Methodist maintained a hostile work environment, and her reporting violations of company policies. Filing 1-2 at 3, 9-10. To overcome Methodist's evidence that her separation was

19

not an adverse employment action as outlined in part 1 above, Martin must allege facts showing direct evidence of discrimination, or if direct evidence of discrimination is lacking, she must allege facts that create an inference of discrimination under the *McDonnell Douglas* burden shifting framework. *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct." *Id.*

The Court cannot find any direct evidence in this record of retaliatory scrutiny of Martin's job performance. There is no direct evidence that the supervision or job performance scrutiny Martin received differed in any way from the supervision and job performance scrutiny Collins exercised regarding all other mammographers. There is only Martin's belief that she was supervised or evaluated differently from the others. Such belief can only provide, at best, a metaphysical doubt as to material facts and is not sufficient to overcome Methodist's evidence that Martin was not treated differently in terms of supervision or job performance scrutiny.

Martin's claims that her quality control job duties were removed, and she was disqualified from receiving a bonus as a result of the July 28, 2015 misconduct documentation and meeting with Collins. Filing 49-6. However, the misconduct documentation shows that Collins removed Martin from performing quality control duties because she was not performing those tasks in a timely manner, and her workflow was not where it should have been. There is no direct evidence that removing Martin's quality control duties was in response to Martin engaging in statutorily protected conduct, and there is no direct evidence that removal of her quality control duties had any effect on her job status, seniority, pay grade, or any other aspect of her job.

Martin's inability to perform quality control duties in a timely manner along with problems associated with her workflow and her continuing use of her cell phone during work hours resulted in Collins' decision to write Martin up, which resulted in Martin not receiving a bonus. Again, there is no direct evidence that the write-up was in response to Martin engaging in any statutorily protected conduct.

Under the *McDonnell Douglas* framework, the initial burden is on Martin to establish a prima facie case that (1) she engaged in statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection exists between the two events. *Lors*, 746 F.3d at 867. If Martin establishes a prima facie case, then Methodist must show a non-retaliatory reason for the adverse employment action. *Id.* If Methodist demonstrates a legitimate non-retaliatory reason for its action, then the burden shifts back to Martin "who is then obligated to present evidence that (1) creates a question of fact as to whether [Methodist's] reason was pretextual and (2) creates a reasonable inference that [Methodist] acted in retaliation." *Id.*

Even if the Court were to assume that Martin proved a prima facie case, she has failed to demonstrate that the matters detailed in the July 28, 2015 misconduct documentation were pretextual. Filing 49-6. To create a question of fact regarding whether Methodist's reasons for the misconduct documentation was pretextual, Martin can either present direct or indirect evidence that the matters stated in the documentation were false or show that although the matters in the documentation may be true, Methodist was motivated to present the issues as a misconduct event in retaliation. *Lors*, 746 F.3d at 868.

In her deposition, Martin was asked to respond to the content of the misconduct documentation. Filing 55-5 at 202-17. Although she quibbled about certain immaterial details, she did not dispute the substance of the misconduct: that patients were waiting and that Martin was on her cell phone during work hours. Martin claimed that she wasn't the cause of the workflow problems even though she did not deny that the workflow problems with her patients were occurring. Additionally, Martin does not provide an evidentiary basis sufficient to support a conclusion that the documentation of her misconduct, although true, was nonetheless pretextual.

Finally, Martin alleges that that she wasn't hired in July for the radiologist position at the Valley clinic in retaliation for filing a complaint with the Nebraska Equal Opportunity Commission in March. Martin argues that if Collins hadn't given her a bad reference, she could have gotten the radiologist job at the Valley Clinic. Filing 54 at 30. The evidence does not support Martin's argument.

The fact that Methodist's human resources department determined that Martin was qualified for the Valley position and forwarded her application to Patricia Petersen argues against any inference that Methodist was retaliating against Martin. Moreover, Collins did not give Martin a bad reference. When Petersen called Collins about Martin, Collins simply told her to contact human resources. Martin presents no evidence to the contrary. And although Petersen said this was a red flag for her, she also said that she did not exclude Martin because of Collins' comment.

The fact is, Collins said the only thing she could say about Martin. Telling Petersen to call human resources is neither a good or bad recommendation and cannot be thought of as retaliation. Collins had ample reason to give Martin a bad recommendation regarding her job performance—

without any reference to the NEOC complaint—but didn't. In fact, it isn't clear that Collins even knew about the NEOC complaint. Finally, Petersen testified that after setting Martin's application aside due to Collins' response, the perfect candidate appeared, and Petersen hired her. Thus, the evidence shows that Petersen made a decision independent of Collins' comment when she hired the person she believed was an excellent fit for the job. Martin has presented no evidence of a causal relationship between anything Collins did and Martin's failure to get the Valley job.

The Court finds that there is no evidence that would allow a jury to find that Methodist retaliated against Martin for reporting policy violations, or for making a NEOC complaint, or for any other reason.

### 3. FAMILY MEDICAL LEAVE ACT VIOLATION AND WHISTLEBLOWER RETALIATION

Martin represents in her brief that her claims under the Family Medical Leave Act and whistleblower retaliation should be dismissed by the Court on summary judgment. Filing 54 at 1 n.1.

### 4. WAGE PAYMENT ACT VIOLATION

Martin alleges that while employed with Methodist, she was not compensated for her work performing quality control from January 2015 to July 2015. Filing 1-2 at 12-13; filing 54 at 31. Methodist argues that Martin has failed to specifically identify the wages that she claims she was not paid. Martin argues that her claim of unpaid wages is supported by the several pages of quality control forms and security logs she submitted as evidence in opposition to Methodist's summary judgment motion. Martin's evidence,

however, does not specify the dates or times when Martin was not paid wages, or the amount of wages she claims are due and owing.

Methodist has the initial responsibility to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact regarding Martin's unpaid wages. *See Torgerson*, 643 F.3d at 1042. If Methodist carries its burden, then Martin is required to respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

Under Nebraska law, a plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages. *Pribil v. Koinzan*, 665 N.W.2d 567, 572 (Neb. 2005). The general rule is that uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis. *Id.* Moreover, whether the evidence of damages is reasonably certain is a question of law for the court. *Id.*

Martin's proof of her unpaid wages is a mass of forms and print-outs that do not shed light on the days that she claims she did not get paid for working, the work that she actually performed for Methodist, the amount of time she was engaged in the performance of her duties, the compensation she claims she did not receive, or whether her work was authorized by Methodist. In short, Martin failed to provide the Court with a reasonably certain basis to conclude that she is entitled to compensation for unpaid wages. It was Martin's burden to direct the Court to the specific evidence regarding her unpaid wages.

This is not a case concerning uncertainty over an amount that is due. The uncertainty inherent in Martin's evidence goes straight to whether she is entitled to unpaid wages at all. The Court find that as a matter of law, Martin

has failed to provide evidence showing a reasonably certain basis for her claim regarding unpaid wages.

## III.   CONCLUSION

The Court finds that Methodist's motion for summary judgment should be granted regarding all claims in Martin's amended complaint.

IT IS ORDERED:

1.     Defendant's motion for summary judgment is granted.

2.     Plaintiff's complaint is dismissed.

3.     A separate judgment will be entered.

Dated this 21st day of February, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge